UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | DOCKET NO.  2:22-cr-16-JDL |
| | ) | 2:22-cr-112-JDL |
| JOSHUA MASON | ) | |

**DEFENSE SENTENCING MEMORANDUM**

**Summary**

We suggest a sentence of time served followed by three years of supervised release with the standard and PSR recommended special conditions and restitution. Supervision for the next three years is "sufficient but not greater than necessary" based on application of the sentencing factors set out in 18 U.S.C. §3553(a) and in particular the nature and circumstances of the offense and the characteristics of the offender. Josh has demonstrated further incarceration is unnecessary. For the past 21 months Josh has been on bail and in compliance with all the conditions of release. He has addressed his mental health, reunited with his family, and begun working. He has begun restitution payments. He is caring for his children and his mother who is under treatment for cancer. Society is safer keeping Josh on his current path. There are no outstanding objections to the Revised PSR.

**Joshua Mason**

Joshua is 40 years old. His life changed dramatically the summer after his high school graduation. Nineteen your old Josh had recently graduated from Oxford Hills High School with a 3.5 GPA. PSR ¶ 63. He had enlisted in the U.S. Air Force and was excited to begin. On the night of August 5, 2002,  Josh was driving his pick-up truck and his best friend was in the front seat with him. Neither had on a seat belt. Josh took a curve too fast, went off the road and struck a bolder.  He and his friend were both thrown through the windshield. His friend died. Josh was close to death with fourteen broken ribs, herniated back discs and a

serious traumatic brain injury (TBI). He was flown by life flight helicopter to Central Maine Medical Center - "code blue" stopped breathing. PSR ¶¶ 41, 53-55, 58-59. He was in the hospital for weeks and upon release he had a year of outpatient neurological therapy to assist him in regaining aspects of his mental capacity. He was diagnosed after the accident with PTSD, depression and anxiety, having suffered from none of these pre-injury. ¶ 55. He was charged with manslaughter in his friend's death. ¶ 41. Josh ultimately pled guilty and fourteen months after the crash was sentenced. Id. He served a year and successfully completed six years of probation including 600 hours of community service. Id. Nothing has ever healed the guilt he feels about the loss of his friend. Nor has Josh ever been the same. PSR ¶ 49; Exhibit 1, letters from family and friends. Before the crash he was a health, strong, happy young man, about to embark on a career in the Air Force. Following the crash Josh was physically and mentally impaired, with brain damage, chronic back pain and mental health effecting all aspects of his life. Id. Dr. Magnuson found Josh has a "long history of mental health and cognitive problems, dating from the car accident." ¶ 58. Dr. Riley notes Josh's "guilt and occasional nightmares about the 2002 accident and the loss of his friend." ¶ 59.

**Post 2002**

Josh grew up in a close family with much activity centered around the Mollyockett Motel, a local landmark his grandparents built and operated.[1] PSR ¶49. His grand father passed in 2002 while Josh was recuperating from the car crash. His grandmother died in 2015. Id. His cousin committed suicide in 2006. Id. Another cousin dies at a young age in 2013. A close friend only age 38 died last summer. Id. Each of these deaths have taken a toll on Josh.

---

[1] The Mollyockett Motel is in Woodstock, Maine, on Route 26 near West Paris, and serves a year round base of those recreating in the Western Mountains.

Josh and his former partner Justine have three children, ages 13 to 19. Never formally married, they lived together until the bank robbery. They met at church. PSR ¶ 50. "The kids mean the world to both of them." Id. Before the robbery the entire extended family had dinner together every Saturday at Josh's parent's home. Id. Josh's father, Kalvin assisted in the construction of a house for Josh, Justine and the children on a lot carved out of Kalvin's yard. Justine cared for the children and the house and Josh worked with his father. "When you went to their home you would see yellow sticky notes everywhere. This was to help Josh remember to take his med's, appointments, and task." Exhibit 1, p. 3, letter of Cathy Mason.

**Events Leading Up to Robbery**

Josh worked with his father until about 2015 when he decided he wanted to gain experience in a full time body shop, not just general repairs. He was hired by multiple shops and moved around some, depending on work and on his physical and mental health. See Exhibit 1, letters of former employers and coworkers at pp. 13-16. His bi-polar disorder had not been diagnosed and during periods of mania or depression it was hard for him to hold a job. In June, 2018 Josh self reported to Spring Harbor Hospital depressed and with auditory hallucinations. A brief stay and medication resulted in a discharge and his feeling "much better." Report of Dr. Magnuson, p.4. Josh sought follow up care at Maine Behavior Health. He was diagnosed with symptoms from a traumatic brain injury and PTSD both related to the 2002 automotive crash, and bipolar disorder. Josh said the new medications were helping. Id. Josh resumed working getting a job at Acme Autobody. Unfortunately on January 17, 2019, Josh suffered an appendicitis requiring surgery. PSR ¶ 58(d). This put him back out of work. Between June, 2018 and the bank robbery in April, 2019, Josh had been in and out of the hospital twice with related job losses on both occasions. Following the appendicitis he was not able to work in the time leading up to the robbery. The family had already received an eviction notice and was about to be "on the street."

Those who know Justine describe her as an excellent mother. Id. However;

> Justine has always been a homemaker and the sole responsibility to provide financially was on the defendant who struggled to maintain long-term employment due to his disability, chronic migraines, and now known, undiagnosed bipolar disorder. She would threaten to leave him and take the children from him if he could not provide adequately. The morning of the offense, she phoned Mason and yelled and threatened him that he needed to come up with rent money immediately, as they had pending eviction proceedings. She was apparently yelling so loud that Mason's father, who Mason was with, heard through the phone even though Mason's father is hard of hearing. She noted that after Mason's brain injury, he can take things literally.

PSR ¶ 51.

**Robbery**

Confused, desperate and in "emotional distress," Josh robbed the bank. He brought the bag of money to Justine so she could pay the rent. Justine promptly notified the police. This was difficult for Justine as the officer notes in his report, she "was clearly upset. Justine has a shaky voice and was crying heavily." #401. When the officers (who had a search warrant) met with Josh he briefly denied involvement but quickly provided a confession and turned the money over to the officers. Id. Josh was then arrested. He was bailed the following day, April 19, 2019.

**Immediate Treatment**

Josh promptly sought treatment at St. Mary's Hospital.  The hospital note begins, "This is a 36-year-old gentleman presenting to the psychiatric emergency room for evaluation of increasing depression with thoughts of suicide with no intent or plan for the past week.

He has history of TBI and bipolar disorder. St. Mary's Note 4/19/22. "The depression has been increasing since January but worse this week after robbing a bank due to financial concerns. He was arrested and is out on bail currently. After his wife turned him into the police last week and he was arrested, the thoughts of suicide significantly increased." Id.

> Patient reports this episode of depression began in January when he had appendicitis resulting in hospitalization and a long recovery. Patient subsequently lost his job working at auto collision center and has not been able to find a new job. He reports they were receiving eviction notices which led to an argument with his wife. Patient was extremely anxious about the pending eviction leading him to plan bank robbery using a mask and toy gun. Patient reports he then came home, showed his wife the money and she called the police.

Id.

Josh was discharged after a two week hospitalization. His final diagnosis is Bipolar disorder, type 1 - depressed, anxiety disorder, traumatic brain injury, migraines. Id. He was prescribed rizatriptan for migraines, Elavil (amitriptyline - an antidepressant), Klonopin (for anxiety), Risperdal (treats bipolar), Topomax (also for migraines), Lamictal (also for bipolar). In addition to cognitive treatment therapy, Josh is currently prescribed the following mental health medications: lamotrigine and Latuda for bipolar disorder, amitriptyline for depression and night terrors, and Celebrex for anxiety. PSR ¶ 57. He is also precribed and takes Propranolol for migraines, tramadol for chronic back pain, methocarbamol for muscle spasms, and at times the doctor adds prednisone. PSR ¶ 53.

**Josh is Not a Future Risk**

The bank robbery of April 17, 2019 began as a state prosecution. Josh was seen by Dr. Elise Magnus, a psychologist, hired by defense counsel, and Dr. Robert Riley, a

Neuropsycologist, hired by the Court. PSR ¶ 58. Both found Josh at low risk to reoffend. In his report to the state court dated 1/25/22, Dr. Riley concludes:

> With regard to Mr. Mason's risk to the community, it does appear that the alleged behavior was likely a one-time event, which appeared to be fully in-service to significant stress and desperation. As stated by Dr. Magnuson, it does not appear that any type of mental health issues played a significant role in his behavior at the time the alleged incident, and, again, his alleged behavior appeared to be out of desperation given significant financial and relationship stress. Mr. Mason does not appear to have a history of similar behaviors in the past, and does not maintain ideas or beliefs which would condone such behavior. Additionally, it has now been nearly three years since the alleged incident. During this time, it does not appear that there have been any further incidents, and Mr. Mason has maintained an appropriate lifestyle, with full-time employment, co-parenting his children, and continuing with mental health treatment. Given this, it does appear likely that he can continue to maintain safety and stability, particularly if he continues with appropriate mental health treatment, which he appears to fully intend on doing.
>
> Mr. Mason does not appear to have a pattern of other factors which would place him at significantly elevated risk of recidivism or additional danger to the public, including not having more severe mental health issues, not having an apparent history of substance abuse issues, and not having a pattern of violence or aggression toward others. Additionally, he has numerous factors present which would generally be seen as decreasing the risk of dangerousness or inappropriate behaviors toward others, including maintaining full-time employment, having a strong support system in the form of his parents and

> other friends, being involved with parenting his children, and continuing with appropriate mental health treatment.

Report of Dr. Riley, PSR ¶ 61.

**The Current Josh**

Josh has been on bail for over four years. There was a lengthy hiatus between his state bail on April 19, 2019 and his federal arrest on July 28, 2021. He was held in primary federal custody until August 20, 2021 when he was released on an unsecured bond and conditions. ECF ##25, 26. Since his federal release he has "complied with all conditions of release. Specifically, he participates in mental health counseling, he is employed full-time as an automotive painter, and he is cooperative with his supervising officer." PSR ¶ 7. The letters in Exhibit 1 from family and friends provide the court with insight in Josh, his background, his support group and the anomalous nature of this offense. He has not hidden his errors from those who care about him. He attends treatment and remains medication compliant. PSR ¶ 57. Josh recognizes that he needs to maintain both in the future.

Josh cares for his mother who is in chemotherapy treatment for cancer. She depends on him. His oldest is about to graduate from High School, his son C. lives with him, and his daughter spends a lot of time with him. His son C. explains what a difference he sees in his father now that josh is diagnosed and taking medication for his bipolar. Exhibit 1, p. 6.

> It's been about 4 years since he robbed that bank and today he is a completely different person. I didn't like being around him than and now I can't wait to see him every time I'm not with him.

Id.

Josh is proud of the autobody business he has established. See photographs, Exhibit 1, pp. 24-27. Particularly post-COVID there is a regional lack of skilled trades people and his customers are dependant on Josh to restore their vehicles. He is providing financial support for the children. Notably, Josh has begun paying restitution in advance of being ordered. In February, Josh sought permission from the court to begin making payments. He has paid the felony assessment in both docket numbers and made payments toward restitution totaling $900. The PSR shows after recovered funds the bank loss is $3,115. PSR ¶ 76. That leaves a balance of $2,215 owing in restitution. If Josh is able to remain working, he will set up a payment plan and be able to make regular payments of restitution. If he is incarcerated the business closes and it is unknown how long it will take for him to regain any degree of financial stability or be able to pay restitution.

**Conclusion**

Josh has admitted and accepted his criminal conduct. He has apologized. He has sought medical and mental health and maintained treatment while on release. He has disclosed his errors to family and friends. He has reunited with his children. He lives with his parents. He is caring for his mother who has cancer. She has undergone radiation and is now beginning chemotherapy. She needs him. Josh has established a business. He is supporting his children. He has begun paying restitution. His is a low risk of recidivism as found by two different psychologist including Dr. Riley who was appointed by the State Court to perform an evaluation. He has been fully compliant with his federal bail. It has been over four years since the bank robbery. Josh has demonstrated his ability to change and has done so. He has accepted the limitations of his mental health and his need to remain medication compliant. He is remorseful and has made significant changes in his life including his mental health medication and treatment.

We ask the court to impose a sentence of time served followed by three years of supervised release with the standard and special conditions of supervision as recommended in the PSR along with restitution, concurrent in both docket numbers. A sufficient, but not greater than necessary sentence.

DATE: May 10, 2023                             /s/ *David Beneman*
                                               David Beneman
                                               Attorney for Joshua Mason

David Beneman
Federal Defender
P.O. Box 595
Portland, Me 0412-0595
207-553-7070 ext. 101
David_Beneman@fd.org

## CERTIFICATE OF SERVICE

I, **David Beneman**, attorney for **Joshua Mason**, hereby certify that I have served, electronically, a copy of the **within "DEFENSE SENTENCING MEMORANDUM"** upon **Johnathan Nathans**, Assistant United States Attorney, United States Attorney's Office, Portland, ME, and all counsel of record via the ECF system.

                                               /s/ *David Beneman*
                                               David Beneman

DATE: May 10, 2023

CC: Joshua Mason

9